# Exhibit A



# Harvey Ruvin
## CLERK of the COURTS
### MIAMI-DADE COUNTY, FLORIDA

## Civil / Probate Justice System – Docket Information

BACK TO SEARCH RESULTS      ALL PARTIES      START A NEW SEARCH

**CRYSTAL CRUISES INC vs ROLLS ROYCE P L C**

\* Click on BOOK/PAGE of a particular docket to see the image if it is available \*

**Case Number (LOCAL):** 2010-60525-CA-01 **Dockets Retrieved:** 4    **Filing Date:** 11/19/2010
**Case Number (STATE):** 13-2010-CA-060525-0000-01    **Judicial Section:** 31

| Date | Book/Page | Docket Entry | Comments |
|------|-----------|--------------|----------|
| 11/19/2010 | | DEMAND FOR JURY TRIAL | |
| 11/19/2010 | | SUMMONS ISSUED | DN01 DN02 DN03 DN04 DN05 DN06 |
| 11/19/2010 | | CIVIL COVER | |
| 11/19/2010 | | COMPLAINT | |

BACK TO SEARCH RESULTS      ALL PARTIES      START A NEW SEARCH

Civil Search Home | Civil Court Information | Email | Login
Home | Privacy Statement | Disclaimer | Contact Us | About Us
2008 Clerk of the Court. All Rights reserved



)141755



CORPORATION SERVICE COMPANY

# Notice of Service of Process

WCE / ALL
**Transmittal Number: 8229538**
**Date Processed: 11/29/2010**

| Primary Contact: | Mary Sullivan |
| | Rolls-Royce North America Inc. |
| | 1875 Explorer St |
| | Suite 200 |
| | Reston, VA 20195 |

| Entity: | Rolls-Royce Commercial Marine Inc. |
| | Entity ID Number  1996738 |
| **Entity Served:** | Rolls-Royce Commercial Marine, Inc. |
| **Title of Action:** | Crystal Cruises, Inc. vs. Rolls-Royce PLC |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Contract |
| **Court/Agency:** | Miami-Dade County Circuit Court, Florida |
| **Case/Reference No:** | 10-60525CA31 |
| **Jurisdiction Served:** | Florida |
| **Date Served on CSC:** | 11/24/2010 |
| **Answer or Appearance Due:** | 20 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | Luis A. Espino |
| | 786-364-8400 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**
*CSC is SAS70 Type II certified for its Litigation Management System.*
2711 Centerville Road   Wilmington, DE 19808   (888) 690-2882   |   sop@cscinfo.com

IN THE CIRCUIT COURT OF THE ELEVENTH
JUDICIALCIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

| DIVISION CIVIL | **SUMMONS** | CASE NUMBER |
|---|---|---|
| | | 10 - 60525CA31 |
| PLAINTIFF<br><br>CRYSTAL CRUISES, INC. and CRYSTAL SHIP THREE (BAHAMAS) LIMITED, | VS. DEFENDANT<br><br>ROLLS-ROYCE PLC, ROLLS-ROYCE AB, ROLLS-ROYCE COMMERICAL MARINE, INC., CONVERTEAM SAS f/k/a ALSTOM POWER CONVERSION SA, ROLLS-ROYCE AB and CONVERTEAM SAS, jointly and severally, d/b/a THE MERMAID CONSORTIUM, | CLOCK IN |

THE STATE OF FLORIDA:

To Each Sheriff of the State:

Served
Date 10-20-10   Time 1020A
MCN, No. 111
is a certified process server in the
You ARE COMMANDED to serve this summons and a copy of the complaint competition in this action on
defendant:                                           in and for the Second Judicial Circuit

ROLLS-ROYCE COMMERCIAL MARINE, INC.
Through its Registered Agent,
Corporation Service Company                    **OR**   Through its Registered Agent for Service of Process
1201 Hays Street                                                    Corporation Service Company
Tallahassee, Florida  32301-2525                          11 S. 12th Street
**OR**                                                                     P.O. Box 1463
14850 Conference Center Drive                          Richmond, Virginia 23218-0000
Chantilly, Virginia 20151

Each defendant is required to serve written defenses to the complaint or petition on Plaintiff's attorney,
whose name and address are as follows:

Luis A. Espino, Esq.
Fowler Rodriguez Valdes-Fauli
355 Alhambra Circle, Suite 801
Coral Gables, FL 33134

within 20 days after service of this summons on that defendant, exclusive of the day of service, and to file
the original of the defenses with the Clerk of this Court either before service on Plaintiff's attorney or
immediately thereafter.  If a defendant fails to do so, a default will be entered against that defendant for the
relief demanded in the complaint or petition.

| CLERK OF COURTS | BY: _____ DEPUTY CLERK. COURT SEAL | DATE NOV 1 9 2010 |
|---|---|---|

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT, IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CRYSTAL CRUISES, INC. and CRYSTAL
SHIP THREE (BAHAMAS) LIMITED,

      Plaintiffs,

vs.

ROLLS-ROYCE PLC, ROLLS-ROYCE
AB, ROLLS-ROYCE COMMERICAL
MARINE, INC., CONVERTEAM SAS f/k/a
ALSTOM POWER CONVERSION SA,
ROLLS-ROYCE AB and CONVERTEAM
SAS, jointly and severally, d/b/a THE
MERMAID CONSORTIUM,

      Defendants.

_____/

CASE NO.:

10-60525CA31

## COMPLAINT

Plaintiffs, Crystal Cruises, Inc. ("CCI") and Crystal Ship Three (Bahamas), Limited

("CST"), sue Defendants, Rolls-Royce PLC ("RRPLC"), Rolls-Royce AB ("RRAB"), Rolls-

Royce Commercial Marine, Inc. ("RRCM"), Converteam SAS f/k/a Alstom Power Conversion

SA, ("Converteam"), and RRAB and Converteam, SAS, jointly and severally, d/b/a The

Mermaid Consortium ("Mermaid Consortium"), and state as follows: [1]

## JURISDICTION AND VENUE

1.    This is an action for damages in excess of fifteen thousand United States dollars

($15,000.00) against all Defendants, exclusive of interests and costs.

---

[1] RRPLC and RRAB are collectively referred to herein as "Rolls-Royce" while Rolls-Royce Commercial Marine,
Inc. is only referred to herein under the acronym "RRCM."
NOLA: 561298_1

2. Venue is proper in Miami-Dade County, Florida because each of the Defendants:

    a. resides in Miami-Dade County, Florida;

    b. does business in Miami-Dade County, Florida either directly or through an agent; and/or

    c. is subject to the jurisdiction of this Court.

3. Pursuant to section 48.193, Florida Statutes (the "Florida Long Arm Statute"), the Defendants have subjected themselves to the jurisdiction of this Court by:

    a. engaging in substantial and not isolated activities within this State either directly or through their respective agents;

    b. operating, conducting, engaging in, and/or carrying on a business or business venture in this State either directly or through their respective agents;

    c. soliciting business in Florida via the mails, telephone, internet and through their personal appearance in trade shows, sales demonstrations, presentations and exhibitions to the cruise line industry in South Florida; and/or

    d. availing themselves of the protections and benefits of the laws of Florida by, among other things, conducting business activities in this State and instituting prior actions in Florida courts.

## PARTIES

4. Plaintiff, CST, is a company registered under the laws of the Bahamas.

5. Plaintiff, CCI, is a California corporation authorized to do business in Florida and having its principal place of business in Los Angeles, California. CCI is the registered operator of the Crystal Serenity, a cruise vessel built specifically to travel all over the world and for use in the passenger trade.

6. Defendant, RRPLC, is a British business entity with its principal place of business in the United Kingdom. RRPLC is the parent company of RRAB and RRCM. RRPLC has

2

conducted and now conducts business in the State of Florida and has maintained systematic and continuous business relationships in this State directly and/or through its subservient subsidiaries, including the open solicitation of business from the largest segment of the cruise industry based in South Florida, and the participation as an exhibitor and/or the attendance at trade shows specifically created for the development of cruise business in Florida. RRPLC, at all time material, marketed its entire line of marine propulsion products and services and sold and delivered these products and services throughout the State of Florida.

7.     Defendant, RRAB, is a Swedish business entity with its principal place of business in Kristenehamn, Sweden. RRAB was formerly known as "Kamewa AB". RRAB has conducted and now conducts business in the State of Florida and has maintained systematic and continuous business relationships in this State directly and/or through its subservient subsidiaries,   including the open solicitation of business from the largest segment of the cruise industry based in South Florida, and the participation as an exhibitor and/or the attendance at trade shows specifically created for the development of cruise business in Florida. RRAB, at all time material, marketed its entire line of marine propulsion products and services and sold and delivered these products and services throughout the State of Florida.

8.     Defendant, RRCM, is a Delaware corporation authorized to do business in Florida with its principal place of business in Chantilly, Virginia.  RRCM has conducted and now conducts business in the State of Florida, and maintains systematic and continuous business relationships in this State.  As set forth below, RRCM performed repairs on the Crystal Serenity.

9.     Defendant, Converteam, is a French business entity with its principal place of business in Belfort, France.  Converteam has conducted and now conducts business in the State

of Florida and has maintained systematic and continuous business relationships in this State directly and/or through its subservient subsidiaries, including the open solicitation of business from the largest segment of the cruise industry based in South Florida, and the participation as an exhibitor and/or the attendance at trade shows specifically created for the development of cruise business in Florida. Converteam, at all time material, marketed its entire line of marine propulsion products and services and sold and delivered these products and services throughout the State of Florida.

10. At all time material, Rolls-Royce and Converteam acted through their respective United States subsidiaries, which acted as their actual and/or apparent agents in dealings with the Plaintiffs. Rolls-Royce and Converteam are thus vicariously liable for the acts and/or omissions of their agents.

11. RRPLC, RRAB and RRCM are merely alter egos of one another. Upon information and belief, RRPLC, RRAB and RRCM, acted as a single corporate entity under the leadership and control of RRPLC by, among other things, disregarding corporate distinctions, failing to observe corporate formalities, sharing common ownership and directorships, and comingling funds. Accordingly, the corporate distinctions between RRPLC, RRAB and RRCM should be disregarded by the Court.

## GENERAL ALLEGATIONS

### THE MERMAID CONSORTIUM

12. Prior to 1997, Kamewa AB (now RRAB) and Alstom Power Conversion, SA (now Converteam) entered into a joint venture for the design, development, manufacture, sale, marketing, service and repair of an innovative podded propulsion system for seagoing vessels

which it marketed and sold under the brand name "Mermaid". The joint venture was referred to by its participants as the "Mermaid Consortium"; and when dealing with the Plaintiffs, they made clear to them that they were acting jointly as members of the Mermaid Consortium.

13.     The Mermaid Consortium was comparatively new to the pod propulsion system industry. Though it claimed to have previously built pods for oil drilling rigs before its entry into the cruise industry, the Mermaid Consortium had not actually constructed propulsion pods for any types of vessels prior to being awarded the first contract for the installation of the Mermaid pods on the Millennium Class vessels it built for Royal Caribbean Cruise Lines.

14.     The cruise ship industry is a major consumer of pod propulsion systems. Accordingly, the Mermaid Consortium developed a marketing strategy and engaged in business activity intended to induce the cruise industry, which included the Plaintiffs, to invest in, purchase, use and/or maintain the Mermaid pod system in cruise vessels.  The Mermaid Consortium continuously engaged in a course of conduct intended to convince the decision making executives acting for the cruise industry, and in particular, the Plaintiffs, to utilize the Mermaid pod system on cruise vessels constructed in various shipyards around the world.

15.     The Defendants analyzed the cruise ship industry, its operation, and its needs. Plans to introduce an optimized pod propulsion system suitable for speeds up to about 30 knots were allegedly developed sometime in 1994.  However, the first Mermaid was not actually constructed until August 1999. It is now apparent that, in their ill-planned collective effort to bring the Mermaid to market on an expedited basis, Rolls-Royce and Converteam failed to undertake the necessary research, development and testing to ensure the proper functioning of

the Mermaid. In other words, they placed a poorly designed and untested product into the stream of commerce.

16. The Mermaid Consortium has been assisted at all material times in its joint venture efforts by Rolls-Royce and Converteam. The Mermaid Consortium joint venturers and the above named Defendants have acted in concert to induce the sale and continued utilization of the Mermaid pod system by cruise line businesses, including Plaintiffs, and to continue the sale of parts and service to the exclusion of other suppliers, at inflated costs and on unconscionable terms. At all time material, Rolls-Royce and Converteam acted individually and as members of the Mermaid Consortium in its dealings with the Plaintiffs.

## CRYSTAL CRUISE SHIPS

17. CCI is the registered operator of the prestigious Crystal Serenity and Crystal Symphony cruise ships. CCI has built its business reputation on an unwavering commitment to delivering its passengers the highest quality service and best oceanic travel experience possible. Repeat passengers constitute a significant portion of CCI's business.

18. As a cruise ship that travels all over the world, oftentimes without access to nearby ports, the Crystal Serenity depends on the reliability and dependability of its propulsion system. As a result, CCI's business and reputation among passengers and travel agents depends in large part on the reliability and dependability of the propulsion system installed on the vessel.

19. CCI has a charter commitment which requires payment of a substantial amount to the charter party regardless of whether the Crystal Serenity has operational problems as well as payment of certain expenses associated with the repair of the vessel.

20.     CST is the bare boat charterer of the Crystal Serenity and is obligated to pay certain expenses associated with the repair the vessel.

21.     CST and CCI are both subsidiaries of Nippon Yusen Kaisha ("NYK").

### THE CRYSTAL SERENITY

22.     On December 12, 2000, NYK signed a formal contract for the construction of the Crystal Serenity with Chantiers De L'Atlantique ("CAT"), the shipbuilder of the vessel. Shortly thereafter, the shipbuilding agreement was assigned to CST. Moreover, CST entered into a supervision agreement with NYK pursuant to which NYK was contractually obligated to handle the affairs related to the construction of the Crystal Serenity under the supervision of CST.

23.     The quality of the performance of Crystal's new flagship vessel and the reliability of its propulsion system were critical to the Plaintiffs. Thus, the Plaintiffs wanted the Crystal Serenity to not only offer the best aspects of cruising, but to do so using a reliable propulsion system and the most advanced technological features in order to deliver the highest level of performance and reliability available in the cruise ship industry.

24.     The shipbuilding contract for the Crystal Serenity specified that podded propulsion would be utilized, but the manufacturer of the pods for the vessel was not determined. The Plaintiffs were provided with a makers list identifying potential manufacturers, one of whom was the Mermaid Consortium.

25.     A cruise ship's performance is inextricably tied to the quality and reliability of its propulsion system. Accordingly, the Plaintiffs desired to employ the most technologically advanced, highest quality, most efficient propulsion system available for the Crystal Serenity. Due to the importance of this decision, the Plaintiffs' representatives and agents were on site and

actively participated in important meetings with the Defendants when making the decision to select the Mermaid propulsion system for the Crystal Serenity. Ultimately, the Plaintiffs were defrauded into selecting the Mermaid based upon the repeated misrepresentations made by Rolls-Royce and Converteam.

26.     As set forth below, the Plaintiffs have been and will continue to be severely damaged as a result of repeated repairs and replacements caused by malfunctions of the Mermaid propulsion system on the Crystal Serenity.

### THE DEFENDANTS DEFRAUD PLAINTIFFS INTO SELECTING MERMAIDS PODS

27.     On or about February 23, 2001, CAT, informed CST that it had selected the Mermaid pods for the Crystal Serenity. Under the shipbuilding contract, CST had the right to approve or reject the selection.

28.     The Plaintiffs were aware of two potential manufacturers for the propulsion pods to be installed on the vessel, ABB and the Mermaid Consortium. During the selection period, the Plaintiffs had become aware of significant problems other cruise lines had experienced with the Mermaids. Of the various problems, perhaps the most significant related to the bearings.

29.     As a result, the Plaintiffs, through their representatives and agents, communicated to the Defendants their concerns regarding the problems experienced by other cruise ships equipped with the Mermaid propulsion system.

### PRE-SELECTION MISREPRESENTATIONS

30.     In order to address the Plaintiffs' concerns, a meeting was scheduled on or about February 26 – 28, 2001, with representatives of Rolls-Royce and Converteam. At the meeting,

Rolls-Royce and Converteam representatives made numerous false representations of material fact regarding the Mermaid propulsion system to the Plaintiffs' representatives and agents.

31.     Several of these misrepresentations were made by Mr. Rabih Khoury of Converteam and Mr. Jan Petterson of Rolls-Royce at the meeting, and included:

    a.   In response to specific questions regarding the lifetime of the bearings, the Mermaid Consortium stated that the thrust bearings had a lifetime of 40,000 hours and 30,000 hours for the radial bearings. They further represented that this calculation was done for the full power running and that the *"real lifetime is higher"* according to a more realistic actual operating profile;

    b.   Representations regarding the pods' increased reliability and reduced maintenance and repair and that the pods experienced no shaftline bearing problems;

    c.   Representations that fewer bearings on the shaftline and use of roller bearings would lead to less transmission losses in comparison with conventional shaftlines; and

    d.   Representations that the pods were based on proven techniques.

32.     In addition, during the meeting, the Plaintiffs' representatives and agents asked for a number of clarifications regarding the Mermaid pods.  In response, Laurent Mazodier, a representative of Rolls-Royce, responded to the inquiries in writing on March 16, 2001.  Mr. Mazodier's correspondence included representations that the bearing lifetime would exceed 30,000 hours on the radial bearing and 40,000 hours on the thrust bearing. It was further represented that these calculations were life times calculated at MCR condition (13.5MW/156 rpm) and the life time with the correct operational profile would be considerably higher.

33.     On March 12, 2001, CST expressed concern in writing regarding the noise problem experienced by the Millennium Class vessels.  On March 28, 2001, Rolls-Royce and Converteam responded that these issues did not affect the ability of the ship to operate and there was no need for repair.

34.     Representatives of Rolls-Royce and Converteam emphasized that the mechanical components (bearings, couplings, *etc.*) employed in the Mermaid would be reliable in performance because they had a long history of use in the shipbuilding industry.

35.     CST made the decision to select two 13.5 MW Mermaid pods for installation on the Crystal Serenity based upon the false and misleading material representations made by Rolls-Royce and Converteam.

36.     Contrary to the representations by the Mermaid Consortium, following the Plaintiffs' selection of the Mermaid, but before delivery and acceptance of the Crystal Serenity, other cruise lines continued to experience problems with the Mermaid propulsion system.

### POST-SELECTION, PRE-DELIVERY MISREPRESENTATIONS

37.     On May 2, 2002, John Nilsen of CCI sent an email to Converteam asking for an update of the problems experienced by other cruise lines.  In a written response, Jon Wheeler, a representative of Converteam, characterized the issues as "teething" problems that would be resolved by the time the Crystal Serenity pods were delivered.

38.     On May 24, 2002, in a meeting held between the Plaintiffs, Converteam and CAT, the Mermaid Consortium made representations to alleviate the Plaintiffs' concerns.  CST requested a POD design and bearing review analysis.  Converteam responded that a final pod design review would take place in July of 2002 and would include a summary of all problems, explanations and adequate countermeasures taken by the Mermaid Consortium.

39.     Further, a meeting was to be held on June 6, 2002, between the Plaintiffs, CAT, Rolls-Royce, and Converteam, to discuss all bearing problems experienced by Mermaid pods on other cruise ships and modifications to the pods for the Crystal Serenity.  The aim of this meeting

was to go though bearing issues and ensure all precautions and modifications had been implemented on the pods for the Crystal Serenity.

40.     At the meeting, Per Nahnfeldt of Rolls-Royce made a presentation to the Plaintiffs in which he claimed that the bearing issues could be resolved and asserted that the thrust bearing lifetime was 91,400 hours or 23 years and the radial bearing running lifetime was 49,200 hours or 12 years.

41.     On June 25, 2002, Stig Lonngren of Rolls-Royce presented a technical report to the Plaintiffs on the Mermaid pods. Mr. Lonngren's presentation suggested that the problem with the bearings was attributable to improper cleaning. Throughout this presentation, the Mermaid Consortium continued to maintain that the lifetime of the bearings was in excess of the five (5) years required by the classification societies.

42.     In June of 2003, the Plaintiffs accepted delivery of the Crystal Serenity with the Mermaid propulsion system based upon the false and misleading material representations made by Rolls-Royce and Converteam.

### MERMAID PODS ON THE CRYSTAL SERENITY FAIL TO PERFORM

### THE 2005 DRY-DOCK

43.     Prior to the Crystal Serenity's first dry docking in November of 2005, a magnetic detector had revealed deterioration in the pod's bearings. Plaintiffs investigated the results and asked Rolls-Royce and Converteam to provide a root cause of the problems.

44.     On November 4, 2005, prior to the first dry-dock, a meeting took place between CST and Rolls-Royce. At the meeting, Rolls-Royce gave a presentation to CST regarding the

cause of the bearings problems and technical improvements it had made to the bearing design since the Crystal Serenity had been delivered.

45.     As a result of these improvements to the bearings, Rolls-Royce and Converteam concluded and represented to CST that the new bearing life would be *91,000 hours*.

46.     At the urging of Rolls-Royce and Converteam and in specific reliance on their false and misleading material representations that the new bearings were improved and would resolve the existing problems, CST changed all of the bearings on the Mermaid pods at the November 2005 dry-dock.

47.     This undertaking came at significant cost to the Plaintiffs.  Despite the fact that Rolls-Royce and Converteam had induced the Plaintiffs to select the Mermaid pods and accept delivery of the Crystal Serenity by representing that the bearings would have a life expectancy of 91,400 hours for the thrust bearing and 49,200 hours for the radial bearing, the vessel's bearings were exchanged after just 17,520 hours of use.

### THE 2008 DRY-DOCK

48.     Following the 2005 dry-dock, problems continued industry wide with the Mermaid bearings.  At Plaintiffs' urging, Rolls-Royce gave Plaintiffs a presentation regarding potential solutions to the pod problems.

49.     Rolls-Royce again made numerous representations to Plaintiffs regarding improvements to the materials and design of the Mermaid pods and particularly the pod bearings.

50.     On November 20, 2007, Stig Lonngren of Rolls Royce made a presentation to representatives and agents of the Plaintiffs regarding the results of the investigation of the bearings removed in 2005, the bearings installed in 2005, and improvements to the bearings

made since the 2005 dry-dock. According to the written report which accompanied the presentation, an independent investigation of the bearings concluded that the manufacturer had already implemented improvements to the bearings installed at the 2005 dry-dock that addressed the metallurgical issues with the original bearings. The improvements included an enhanced level of cleanliness and changes to the forging route and reduction ratio.

51.     Additionally, Mr. Lonngren noted that the wear found on the original bearings was caused by electrical discharges between the roller and washer. The report goes on to suggest that further enhancement had been made to remedy these issues which would further increase bearing lifespan. Of particular importance was Mr. Lonngren's express statement that the new bearings installed at the November 2008 dry-dock would have *lifetime of 501,000 hours for the thrust bearing and 90,000 hours for the radial bearing.* At the time this presentation was made, Rolls-Royce knew or should have known that this bearing life figure was false because they had no testing or evidence whatsoever indicating that the bearing could last even a fraction of that time.

52.     This presentation was designed to induce the Plaintiffs to purchase and install the "enhanced" bearings at the Crystal Serenity's November 2008 dry-dock.

53.     On February 13, 2008, Rolls-Royce representatives Stig Lonngren and Par Malmberg made another presentation to Plaintiffs' representatives and agents detailing even further improvements to the Mermaid pod. In that presentation, Mr. Lonngren concluded that the bearings installed at the 2005 dry-dock were in good condition, with bright and clear surfaces, no cracks or indentations, only minor signs of electric damage and no "cause for concern." However, in the same report, Rolls Royce suggested that the Plaintiffs should replace

13

the existing bearings notwithstanding their satisfactory condition because the proposed replacement bearings were of an improved quality and should be expected to last five (5) years.

54.    Additionally, in a July 30, 2008 e-mail to CCI representative Knut Aune, Rolls Royce claimed that its experience with the new type of bearing was very good with "no indications of problems at all."

55.    Rolls-Royce recognized that the bearing design installed on the Crystal Serenity during her 2005 dry-dock was not adequate for its purpose, and thus presented this new "enhanced" design to induce the Plaintiffs to replace the Crystal Serenity bearings during the next dry-dock. Based upon the representations made by Stig Lonngren, and other Rolls-Royce representatives during numerous meetings, presentations, telephone conversations and other communications, Plaintiffs replaced all of the bearings on all of the Mermaid pods after only three years in operation at the 2008 dry-dock.

56.    Although Rolls-Royce represented that the bearings installed during the 2008 dry-dock would last 60 months, they have nonetheless "recommended" that the bearings be replaced yet again. Upon information and belief, Rolls-Royce made the "recommendation" because it fears the replacement bearings will not last for the stated lifetime. Unless the bearings are replaced again, the Crystal Serenity's pods are at risk of a sudden failure at sea such as those that have plagued Mermaid pods in the past.

## THE STARBOARD POD FAILURE

57.    Following the 2008 dry-dock, a series of Mermaid pod problems began occurring on the Crystal Serenity. Once again, the Plaintiffs contacted Rolls-Royce and Converteam to resolve the problems. Rolls-Royce responded through their Florida agents, including RRCM,

and analyzed the problems while the Crystal Serenity was docked in Miami, Florida in December of 2008.

58.   After its departure from South Florida, while the Crystal Serenity was on route from Adelaide to Perth, Australia, the vessel suffered a significant electrical short circuit in the starboard pod. Investigation into the fault resulted in the discovery of a welding rod traced to a Swedish manufacturer, which was left inside the starboard pod. Once the rod was removed, Converteam cleared the Plaintiffs to energize the pod. This resulted in another short circuit.

59.   Upon information and belief, the welding rod was left inside the starboard pod by Rolls-Royce, Converteam or their affiliates, representatives or agents, including RRCM, when they performed repairs on the Crystal Serenity. Because of this incident, the pod can only be run at 50%. This particular pod problem has left the Plaintiffs with no other choice than to replace the starboard pod with a completely new Mermaid pod at the next scheduled dry-dock in May of 2011.

60.   Despite having caused the problems with the starboard pod, Rolls-Royce and Converteam are nonetheless attempting to profit from their negligence by offering to replace the pod at full cost to CST.

61.   The Plaintiffs have incurred and will continue to incur substantial repair costs in the future because of the 2009 earth fault to the starboard pod.

### THE DEFENDANTS' COVER UP AND CONSPIRACY TO CONCEAL THE TRUTH

62.   Since these problems have first appeared, Rolls-Royce and Converteam have engaged in an ongoing conspiracy to cover up, fraudulently conceal and prevent the Plaintiffs from discovering the fact that the Mermaids suffer from numerous design and manufacturing

defects. The purpose of this conspiracy was twofold. First, to defraud the Plaintiffs into selecting the Mermaids and accepting delivery of the Crystal Serenity equipped with Mermaids. Moreover, Rolls-Royce and Converteam conspired to fraudulently conceal the true problems with the Mermaid from the Plaintiffs in an effort to prevent them from filing suit and asserting their rights against the Defendants.

63. Rolls-Royce and Converteam deceived, and conspired to deceive, Plaintiffs into believing that the problems encountered with the Mermaids on other vessels were resolved, even though Rolls-Royce and Converteam knew that, since such problems were not actually resolved, it was substantially certain that the pods would continue to experience failures.

64. When the Plaintiffs raised concerns regarding the Mermaid propulsion system, Rolls-Royce and Converteam fraudulently concealed the extent of the defects with the Mermaid pods and continued the fraud by repeatedly reassuring the Plaintiffs that improvements to the pods would resolve any existing problems.

65. Upon information and belief, Rolls-Royce and Converteam knew that each time they purported to cure a defect with the pod, it would fail to resolve the problem. In reality, Rolls-Royce and Converteam did not have a solution for the complex design and manufacturing defects plaguing the Mermaids installed on the Crystal Serenity, nor did they want to incur the cost of undertaking a complete redesign.

66. Upon information and belief, Rolls-Royce and Converteam knowingly decided to deceive the Plaintiffs into believing that the Mermaids could be made to function properly instead of admitting to them that the Mermaids suffered from numerous complex designs and manufacturing defects that they could not or would not solve. Because Rolls-Royce and

16

Converteam are the only manufacturers of the Mermaid, the Plaintiffs relied upon their representations regarding the pods.

67.    As a direct and proximate result of these misrepresentations, the Plaintiffs failed to learn of the fraud perpetuated by Rolls-Royce and Converteam, and have suffered, and will continue to suffer, millions of dollars in damages due to costs of repairs, maintenance, monitoring systems and analysis.

68.    All conditions precedent to the prosecution of this action has been performed, satisfied, excused or waived.

69.    Plaintiffs have incurred, and will continue to incur, attorneys' fees and costs directly attributable to the wrongful conduct of each of the named Defendants.

## COUNT I

### Breach of Implied Warranty of Fitness for Particular Purpose
### (Against Rolls-Royce, Converteam and the Mermaid Consortium)

70.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 69 above as If fully set forth herein.

71.    Rolls-Royce and Converteam were and are the designers, manufacturers, marketers, servicers, repairers, sellers and/or distributors of the Mermaid pod propulsion system.

72.    Rolls-Royce and Converteam have had numerous direct contacts with the Plaintiffs' representative and agents, in person, by telephone, and through written correspondence, including the furnishing of diagrams, technical drawings and other informational materials, in which they informed them that the Mermaid was a proven and reliable propulsion system with a design, technology and features that were superior to the other

pod system on the market and conventional propulsion systems used on cruise ships, and which was especially suited for the particular operational needs of the Crystal Serenity.

73. At the time Rolls-Royce and Converteam made these statements regarding the Mermaid, they had reason to know, and did know, of the particular purposes for which, and operational conditions in which, the Plaintiffs intended to operate the Mermaids on the Crystal Serenity. Specifically, Rolls-Royce and Converteam knew that the Crystal Serenity would be operated primarily as a cruise ship traveling worldwide and would be subject to increased stresses and punishing conditions.

74. At the time Rolls-Royce and Converteam made these statements regarding the Mermaid, they had reason to know that the Plaintiffs were relying in good faith upon their skill and judgment to select or furnish a suitable propulsion system for the particular purposes and operational conditions in which the Plaintiffs intended to use the Crystal Serenity.

75. The Plaintiffs did in fact rely upon the skill, judgment and representations of Rolls-Royce and Converteam regarding the Mermaids when deciding to select the Mermaids for installation on the Crystal Serenity and in deciding to accept delivery of the Crystal Serenity with the Mermaid pods after the numerous problems occurring on other Mermaid-equipped vessels.

76. The representations made by Rolls-Royce and Converteam created an implied warranty that the Mermaids were fit for the particular operational needs of the Plaintiffs and the Crystal Serenity.

77. Rolls-Royce, Converteam and the Mermaid Consortium breached their implied warranties to the Plaintiffs in that the Mermaid pods installed on the Crystal Serenity were defective, unreliable, and unsuitable for the particular purpose for which they were purchased.

In particular, the Mermaids have a defective bearing design and numerous defective electrical components which render the units subject to constant and continuous maintenance problems and premature repair and replacement of various component parts causing the Plaintiffs to suffer significant damages.

78.    In fact, the Mermaids delivered by Rolls-Royce and Converteam to the Plaintiffs are unsuitable for use on a cruise ship because of significant design and manufacturing defects that these Defendants are unable to repair.   In addition, it is apparent from the problems experienced with the Mermaid pods that Mermaid propulsion technology is not a proven technology, and cannot be made to perform as warranted.

79.    As a direct and proximate result of the breaches of the implied warranty of fitness for a particular purpose by Rolls-Royce, Converteam and the Meramid Consortium, the Plaintiffs have suffered substantial damages, including, but not limited to, repair costs, pod monitoring and analysis costs.

<u>**COUNT II**</u>

**Breach of Implied Warranty of Merchantability**
**(Against Rolls-Royce, Converteam and the Mermaid Consortium)**

80.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 69 above as If fully set forth herein.

81.    Rolls-Royce and Converteam were and are the designers, manufacturers, marketers, servicers, repairers, sellers and/or distributors of the Mermaid and are "merchants" of Mermaids.

82.    Rolls-Royce and Converteam have had numerous contacts with the Plaintiffs' representatives and agents in person, by telephone, and through written correspondence,

including the furnishing of diagrams, technical drawings and other informational materials, in which these Defendants informed them that the Mermaid was a proven and reliable propulsion system fit for the ordinary purpose of propelling cruise ships.

83.     Rolls-Royce and Converteam made numerous and direct affirmations to the Plaintiffs' representatives and agents about the Mermaid propulsion system creating implied warranties of merchantability in the Plaintiffs' agreement to install Mermaids on the Crystal Serenity and in deciding to accept delivery of the Crystal Serenity with the Mermaid pods after the numerous problems occurring on other Mermaid-equipped vessels.

84.     Rolls-Royce, Converteam and the Mermaid Consortium breached their implied warranties of merchantability because the Mermaid is not fit for the ordinary purpose of propelling a cruise ship.  In fact, the Mermaids delivered by Rolls-Royce and Converteam to the Plaintiffs are entirely unsuitable for use on a cruise ship because of significant design and manufacturing defects that neither Rolls-Royce nor Converteam have been able to repair.  In addition, it is clear that Mermaid propulsion technology is not yet proven technology, and Rolls-Royce and Converteam have been unable to make the Mermaid fit for the ordinary purpose of propelling a cruise ship around the world.

85.     As a direct and proximate result of the breaches of the implied warranty of merchantability by Rolls-Royce, Converteam and the Mermaid Consortium, the Plaintiffs have suffered substantial damages, including, but not limited to, repair costs, pod monitoring and analysis costs.

NOLA: 561298_1                                   20

## COUNT III

### Breach of Express Warranty
### (Against Rolls-Royce, Converteam and the Mermaid Consortium)

86.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 69 above as if fully set forth herein.

87.    Rolls-Royce and Converteam were and are the designers, manufacturers, marketers, servicers, repairers, sellers and/or distributors of the Mermaid and are "merchants" of Mermaids.

88.    Rolls-Royce and Converteam have had numerous contacts with the Plaintiffs' representatives and agents in person, by telephone, and through written correspondence, including the furnishing of diagrams, technical drawings and other informational materials, regarding the Mermaid pods.

89.    In or about 2001, when the Plaintiffs were deciding which propulsion system to select for the Crystal Serenity, Rolls-Royce and Converteam made numerous and direct affirmations to the Plaintiffs regarding the Mermaid pods, particularly the lifetime of the bearings. During this pre-selection period, Rolls-Royce and Converteam made affirmations to the Plaintiffs that the thrust bearings had a lifetime of at least 40,000 hours and the radial bearings had a lifetime of at least 30,000 hours.

90.    In or about 2002, following the Plaintiffs' selection of Mermaid, but prior to their acceptance of the Crystal Serenity, Rolls-Royce and Converteam again made numerous and direct affirmations to the Plaintiffs regarding the Mermaid pods, particularly the lifetime of the bearings. During this post-selection, pre-delivery period, Rolls-Royce and Converteam made

affirmations to Plaintiffs that the thrust bearing had a lifetime was 91,400 hours or 23 years and the radial bearing running had a lifetime of 49,200 hours or 12 years.

91.     The affirmations set forth in paragraphs 91-92 formed a basis of the bargain for the Plaintiffs when they decided to select the Mermaid and accept delivery of the Crystal Serenity.

92.     In or about 2005, Rolls-Royce and Converteam made numerous and direct affirmations to the Plaintiffs that they had improved the bearing design so that the new bearing life would be 91,000 hours.  At the urging of Rolls-Royce and Converteam and as part of the basis of the bargain, CST and CCI changed all of the bearings on the Mermaid pods at the 2005 dry-dock.

93.     In or about 2008, Rolls-Royce and Converteam made numerous and direct affirmations to the Plaintiffs that they had further improved the bearing design so that it would have a lifespan of lifetime of 501,000 hours for the thrust bearing and 90,000 hours for the radial bearing.  At the urging of Rolls-Royce and Converteam and as part of the basis of the bargain, CST and CCI again changed all of the bearings on the Mermaid pods at the 2008 dry-dock.

94.     Rolls-Royce, Converteam and the Mermaid Consortium breached their express warranties in that the expected lifespan of the original Mermaid bearings and the expected lifespan of both sets of the replacement Mermaid bearings are drastically shorter than what was represented to the Plaintiffs.

95.     As a direct and proximate result of the breaches of express warranty by Rolls-Royce, Converteam and the Mermaid Consortium, the Plaintiffs have suffered substantial damages, including, but not limited to, repair costs, pod monitoring and analysis costs.

## COUNT IV

### Negligent Misrepresentation
### (Against Rolls-Royce, Converteam and the Mermaid Consortium)

96.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 69 above as if fully set forth herein.

97.     In the course of their business, Rolls-Royce and Converteam, either directly or through their agents, made numerous representations of material fact regarding the design, development, testing, deployment, quality, performance, reliability, cost-efficiency, maintenance, dry docking requirements and operational benefits of the Mermaid propulsion system to the Plaintiffs, including, but not limited to, those set forth in paragraphs 30-34, 37, 40-41, 45, 50-51 and 53-54 herein.

98.     The above representations were made by Rolls-Royce and Converteam to the Plaintiffs and were false when made.

99.     In the exercise of reasonable care under the circumstances, Rolls-Royce Converteam should have known that these representations were false at the time they were made.

100.    At the time Rolls-Royce and Converteam made these misrepresentations, they intended and/or expected that the Plaintiffs would rely upon these false representations in selecting the Mermaid pods for installation on the Crystal Serenity and accepting delivery of the vessel.

101.    The Plaintiffs reasonably and justifiably relied on these misrepresentations to their detriment. But for the misrepresentations by Rolls-Royce and Converteam, the Plaintiffs would not have: (a) selected the Mermaid pods for the Crystal Serenity; (b) accepted delivery of the vessel; (c) agreed to replace the bearings at the 2005 and 2008 dry-docks.

NOLA: 561298_1                                      23

102.   As a direct and proximate result of the negligent misrepresentations by Rolls-Royce, Converteam and the Mermaid Consortium, the Plaintiffs have suffered substantial damages, including, but not limited to, repair costs, pod monitoring and analysis costs.

<u>**COUNT V**</u>

**Fraud in the Inducement**
**(Against Rolls-Royce, Converteam and the Mermaid Consortium)**

103.   Plaintiffs re-allege and incorporate by reference paragraphs 1 through 69 above as if fully set forth herein.

104.   In order to induce the Plaintiffs to select the Mermaid propulsion system for installation on the Crystal Serenity and accept delivery of the vessel after numerous and significant problems with the Mermaid systems on other cruise ships, Rolls-Royce and Converteam made numerous representations of material facts regarding the design, development, testing, deployment, quality, life span, performance, reliability, cost-efficiency, maintenance, dry docking requirements, and operational benefits of the Mermaid to the Plaintiffs, including, but not limited to, those set forth in paragraphs 30-34, 37, 40-41, 45, 50-51 and 53-54 herein.

105.   Rolls-Royce and Converteam knew or should have known that these representations of material fact were false at the time they were made, and/or made these representations without knowledge of their truth or falsity.

106.   Rolls-Royce and Converteam made these misrepresentations of material facts with the intent that the Plaintiffs would rely on the misrepresentations and to induce the Plaintiffs to act on them by: (a) selecting the Mermaid propulsion system for installation on the Crystal Serenity; (b) accepting delivery of the vessel; and (c) agreeing to replace the bearings.

107.   The Plaintiffs reasonably and justifiably relied on these misrepresentations of material fact to its detriment.  But for the misrepresentations of material fact by Rolls-Royce and Converteam, the Plaintiffs would not have: (a) selected the Mermaid pods for the Crystal Serenity; (b) accepted delivery of the vessel; or (c) replaced the bearings at the 2005 and 2008 dry-docks.

108.   As a direct and proximate result of the fraudulent inducements of Rolls-Royce, Converteam and the Mermaid Consortium, the Plaintiffs have suffered substantial damages, including, but not limited to, repair costs, pod monitoring and analysis costs.

## COUNT VI

**Fraudulent Nondisclosure**
**(Against Rolls-Royce, Converteam and the Mermaid Consortium)**

109.   Plaintiffs re-allege and incorporate by reference paragraphs 1 through 69 above as if fully set forth herein.

110.   From 2000 to the present, Rolls-Royce and Converteam have failed to disclose to the Plaintiffs and have suppressed material facts with the intent to deceive the Plaintiffs. Specifically, the Defendants have failed to disclose that they had not yet cured the defects that existed in the Mermaid propulsion system experienced by other cruise lines.

111.   Rolls-Royce and Converteam had a duty to disclose these facts because: (a) the information was in their exclusive power; (b) they actively concealed this information; and (c) they made partial statements of facts and did not disclose the whole truth.

112.   As a result of Rolls-Royce's and Coverteam's failure to disclose the foregoing material facts, the Plaintiffs: (a) selected the Mermaid pods for the Crystal Serenity; (b) accepted delivery of the vessel; and (c) agreed to replace the bearings at the 2005 and 2008 dry-docks.

113.   As a direct and proximate result of Rolls-Royce's, Coverteam's and the Mermaid Consortium's failure to disclose material facts, the Plaintiffs have suffered substantial damages, including, but not limited to, repair costs, pod monitoring and analysis costs.

**COUNT VII**

**Negligent Performance of Services**
**(Against all Defendants)**

114.   Plaintiffs re-allege and incorporate by reference paragraphs 1 through 69 above as if fully set forth herein.

115.   In the course of their business, Rolls-Royce and Converteam supply cruise ship operators, such as the Plaintiffs, with their advice and services regarding the operation and maintenance of the Mermaid and the dry docking requirements of the Mermaid.  Rolls-Royce and Converteam provide their skills and services for the service, maintenance and repairing of the Mermaids on these cruise ships.

116.   Rolls-Royce and Converteam had a duty of reasonable care to the Plaintiffs to provide services in accordance with the standard of care used by similar providers in the community under similar circumstances.

117.   Prior to and after the delivery of the Crystal Serenity, Rolls-Royce and Converteam, directly and through their subsidiaries in Florida acting as their agents, including RRCM, serviced, maintained and repaired the Mermaids for the Crystal Serenity.  The servicing, maintenance and repairs of the Mermaids on the Crystal Serenity were performed by and through employees, agents and representatives of Rolls-Royce and Converteam.

118.   The Defendants breached their duty to the Plaintiffs by failing to provide reasonable services in the inspection, diagnosis and repairing problems with the operation and

performance of the Mermaids.  The Mermaids have failed to perform their intended purpose as they were improperly serviced, maintained and repaired.

119.   Specifically, the Defendants were negligent in failing to repair the problems with the bearings.  Moreover, the Defendants were negligent in leaving a welding rod in the starboard pod, presumably during one of the dry-docks.

120.   As a direct and proximate result of the negligent services rendered by the Defendants, the Plaintiffs have suffered substantial damages, including, but not limited to, repair costs, pod monitoring and analysis costs.   Plaintiffs are also entitled to consequential and incidental damages as a result of, among other things, the repeated interruptions of operations and the granting of future cruise credits to passengers whose trips were impacted by defects with the Mermaid pods.

## COUNT VIII

### Negligent Manufacture of Products
### (Against Rolls-Royce, Converteam and the Mermaid Consortium)

121.   Plaintiffs re-allege and incorporate by reference paragraphs 1 through 69 above as if fully set forth herein.

122.   Rolls-Royce and Converteam were and are the designers, manufacturers, marketers, servicers, repairers, sellers and/or distributors of the Mermaid pod propulsion system.

123.   Rolls-Royce and Converteam have had, at all material times, a duty of reasonable care to the Plaintiffs to provide a reliable, operationally efficient, sound product that was fit for commercial operation.

124.   Rolls-Royce and Converteam were well aware of the harm that would arise from the defective manufacture of its Mermaid pods as it had numerous direct contacts with the

Plaintiffs and knew that these particular Mermaid pods were intended for installation in the Crystal Serenity.

125.    Rolls-Royce and Converteam were negligent in their manufacture of the Mermaid pods, in that the Mermaid pods installed on the Crystal Serenity were defective and unreliable.

126.    As a direct and proximate result of the negligent manufacture of the Mermaid pods by Rolls-Royce, Converteam and the Mermaid Consortium, the Plaintiffs have suffered substantial damages, including, but not limited to, repair costs, pod monitoring and analysis costs.

## COUNT IX

### Breach of Warranty of Workmanlike Performance
### (Against all Defendants)

127.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 69 above as if fully set forth herein.

128.    As a separate cause of action under the general maritime law, Plaintiffs aver that Defendants, directly and through their subsidiaries in Florida, which acted as their agents, breached their warranties of workmanlike performance for failure to perform inspections and repairs of the Mermaids aboard the Crystal Serenity in a workmanlike manner.

129.    Prior to and after delivery of the Crystal Serenity, the Defendants held themselves out as competent and able to inspect, diagnose and repair problems with operation and performance of the Mermaids, but have repeatedly failed to do so in numerous instances, including, among others, as set forth hereinabove.

130.    As a direct and proximate result of the breach of the warranty of workmanlike performance by the Defendants, the Plaintiffs have suffered substantial damages, including, but

NOLA: 561298_1                                          28

not limited to, repair costs, monitoring costs, consequential and incidental damages. Plaintiffs are also entitled to consequential and incidental damages as a result of, among other things, the repeated interruptions of operations and the granting of future cruise credits to passengers whose trips were impacted by defects with the Mermaid pods.

## COUNT X

### Civil Conspiracy
### (against Rolls-Royce and Converteam)

131. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 69 above as if fully set forth herein.

132. Rolls-Royce and Converteam entered into an agreement to defraud and deceive the passenger cruise industry, and specifically the Plaintiffs, as to the design, development, testing, deployment, quality, performance, reliability, cost-efficiency, and operational benefits of the Mermaid.

133. Rolls-Royce and Converteam additionally entered into an agreement to defraud and deceive the Plaintiffs regarding their ability to make the defective Mermaid function as represented.

134. Rolls-Royce and Converteam additionally entered into an agreement to defraud and deceive the Plaintiffs by refusing to disclose to them the true nature of the design and manufacturing defects from which the Mermaid suffered, which information was known to these Defendants.

135. Rolls-Royce and Converteam engaged in tortious acts in furtherance of the above agreements.

136.   Rolls-Royce and Converteam conducted overt acts in furtherance of the tortious agreements into which they entered by actively defrauding and deceiving the Plaintiffs on numerous instances as set forth in the general allegations and counts above.

137.   The overt acts taken by Rolls-Royce and Converteam in the furtherance of the tortious conspiracies described herein were the direct and proximate cause of substantial damages to the Plaintiffs, including, but not limited to, repair costs, pod monitoring and analysis costs.  Plaintiffs are also entitled to consequential and incidental damages as a result of, among other things, the repeated interruptions of operations and the granting of future cruise credits to passengers whose trips were impacted by defects with the Mermaid pods.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment be entered in their favor and against Defendants as follows:

A.   actual compensatory, consequential, incidental, special and exemplary damages in an amount to be proven at trial;

B.   such civil penalties as allowed by law;

C.   pre-judgment and post-judgment interest as allowed by law; and

D.   such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury in this action.

Dated the 19th day of November, 2010.

Respectfully submitted,

By: _____
    Luis A. Espino, Esquire
    *Florida Bar No. 008443*
    Lespino@frvf-law.com
    Antonio J. Rodriguez, Esquire
    ajr@frvf-law.com
    George J. Fowler, III, Esquire
    fow@frvf-law.com
    *PRO HAC VICE*
    **FOWLER RODRIGUEZ VALDES-FAULI**
    355 Alhambra Circle, Suite #801
    Coral Gables, Florida 33134
    Tel.: (786) 364-8400
    Fax: (786) 364-8401
    www.frvf-law.com
    *Attorneys for Plaintiffs*